## UNITED STATES v. PENNSYLVANIA CO.

(District Court, W. D. Pennsylvania. February 9, 1917.)

No. 1574.

1. MASTER AND SERVANT ⬥⟿13—HOURS OF SERVICE ACT—CONSTRUCTION—LOCAL CONDITIONS.

Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), was intended to apply in every part of the United States, without regard to difference between local conditions, and must be given a construction which would be sound in every other judicial district.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

2. MASTER AND SERVANT ⬥⟿13—HOURS OF SERVICE ACT—CONSTRUCTION—LIBERALITY.

The Hours of Service Act is so manifestly in the interests of humanity that it should be liberally construed, but because of the penalties imposed its provisions should not be extended beyond their plain meaning.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

3. MASTER AND SERVANT ⬥⟿13—HOURS OF SERVICE ACT—EXCEPTIONS—"CASUALTY"—"UNAVOIDABLE ACCIDENT"—"ACT OF GOD."

In the proviso of the Hours of Service Act, excepting from its operation any case of casualty or unavoidable accident or act of God, or where the delay was the result of a cause not known to the carrier or its officers when the employé left the terminal, and which could not have been foreseen, none of those terms are synonymous; but "casualty" means a fortuitous happening caused by some human agency which the carrier could not control, "unavoidable accident" means a fortuitous happening caused by some human agency over which the carrier may have some control, yet which could not have been prevented by the exercise of due care, and "act of God" is an accident not occasioned by human agency, but by physical causes alone, and in the fourth exception it is the cause, and not the delay, which could not have been foreseen, and this last exception should not be construed to include the others, which would require the immediate suspension of all traffic in the affected division on learning of a wreck, and therefore the act does not apply where the delay resulted from the derailing of another train by the breaking of an axle, which was a casualty, though before the employés in question left the terminal the

---

⬥⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

dispatcher knew of the derailment, but had been informed by the conductor that the track could be cleared within an hour.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.

For other definitions, see Words and Phrases, First and Second Series, Act of God; Casualty; Unavoidable Accident.]

**4. MASTER AND SERVANT** ☞13—HOURS OF SERVICE—CASUALTY—RELIEVING EMPLOYÉ.

Where employés of an interstate carrier are delayed by casualty, so as not to be able to reach their terminal in time, the Hours of Service Act does not require the carrier to relieve them before they reach the terminal, but as to them the limitation of hours of service does not apply.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

**5. MASTER AND SERVANT** ☞13—HOURS OF SERVICE—CONSTRUCTION BY COMMISSION.

A ruling by the Interstate Commerce Commission, which by Hours of Service Act, § 4, is given the duty of executing and enforcing the act, construing a provision of the act, is entitled to great weight, if there is any doubt as to the meaning of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

At Law. Action by the United States against the Pennsylvania Company to recover penalties for alleged violations of the Hours of Service Act. Judgment rendered for defendant.

E. Lowry Humes, of Pittsburgh, Pa., for the United States.

Wm. S. Dalzell, Gordon Fisher, and R. H. Hawkins, all of Pittsburgh, Pa., for defendant.

ORR, District Judge. This action has been brought by the United States to recover from the Pennsylvania Company penalties for alleged violations of the act of Congress entitled "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon," approved March 4, 1907 (34 Statutes at Large, 1415), and commonly called "the Hours of Service Act." The case was tried by the court without a jury, in pursuance of a stipulation in writing, signed by the representatives of both parties. The court finds the facts to be as follows:

On July 3, 1915, five employés of the defendant, which is a common carrier engaged in interstate commerce, were required to remain on duty for a longer period than 16 hours. At the time they were engaged jointly in the operation of a freight train which was being moved by locomotive engine No. 7460. Said train (which may be designated as extra No. 7460), for the purpose of moving interstate commerce, left the terminal at Cleveland at about 4:35 a. m. for Conway, within the jurisdiction of this court, at which place the men were not relieved until about 9:43 or 9:45 p. m. Two of the men had been called for this service at 4:05 a. m. and three at 4:20 a. m. The hours of service of all the men engaged in that train movement were not, therefore, exactly alike, but in each case they exceed 16 hours.

Before extra 7460 left the Cleveland terminal, at about 3:45 a. m., the train dispatcher at that place had received a telephone message from the conductor of a train designated as extra 9981 that his train had been wrecked near Earlville. The information was to the effect

that the east-bound track was badly blocked by three cars; that one car blocked the west-bound track, but that the west-bound track could be cleared within a half an hour or an hour after the wreck train got there. The wreck train arrived at the wreck at 6:50 a. m., but did not have the west-bound track ready for service until 10 o'clock a. m. The east-bound track was not ready for service until late the same evening. The limitation of service to one track during the day congested the traffic. Extra 7460 was the first freight train going east to pass by the scene of the wreck and proceed on its way to its destination. The delay at Earlville was the cause of the excess time of service in which the crew of 7460 were engaged. Had that wreck not occurred, the employés would have reached the end of their run within the time limit. The cause of the wreck of extra 9981 could not have been foreseen or avoided. That train had been inspected before it left the terminal at Cleveland. A wheel upon one of the cars broke by reason of some unknown cause, which derailed three cars of the train. The conductor of that train was qualified by experience with wrecks to express an opinion as to the time which would be required to clear the tracks. Immediately after the wreck he was of opinion that the track could be cleared of the wreck in an hour. He was the man who informed the train dispatcher of the wreck and the conditions existing at the place of the wreck. The train dispatcher relied upon the information given him by said conductor and permitted extra 7460 to leave the terminal.

The contention on the part of the defendant is that by reason of the foregoing facts, the act of Congress does not apply, because of the following provision therein:

"Provided that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officers or agent in charge of such employé at the time said employé left a terminal and which could not have been foreseen."

The contention on the part of the government is that, although the derailment of extra 9981 may have been an unavoidable accident, yet, because the same was known to the train dispatcher before the employés engaged in the movement of extra 7460 had left the terminal, the defendant is still liable. The government further contends that, although the accident to extra 9981 may have been unavoidable, and may have been an excuse for the delay at Earlville, yet the defendant is liable to the penalties imposed by the act, because the crew of extra 7460 were not relieved before they reached their terminal within the period of 16 hours.

[1] The purpose of this act has been well expressed in its title to be:

"To promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon."

It is unnecessary to dwell either upon the economic or other value of such legislation. It was intended to be applicable in every part of the United States, without regard to density of population, difference

between local conditions, or transportation facilities. In the Northern district of Ohio, or in the Western district of Pennsylvania, which together, according to the last census, as gathered from the last report of the Attorney General, had a greater population than all the districts which comprise the Ninth circuit, exclusive of Alaska, the act should not receive a construction which would not be sound in every other judicial district within the United States. The fact that there may be a million people between terminals dependent upon railroad service should not induce a construction of the act which would be unwarrantable in cases where there may be few, if any, people between the terminals who depend upon railroad service. It is necessary, therefore, to avoid the natural tendency to allow the immediate background to control the view of the statute.

[2] The act is so manifestly in the interests of humanity that it should be liberally construed, and yet, because of the penalties impose for violations of the act, its provisions should not be extended beyond their plain meaning. It is highly important that those who may be subjected to penalties for violations of the act should know what acts or omissions may subject them to penalties. The act does not operate against carriers alone, but against officers and agents of carriers as well. Its terms apply to both equally, and should be read at all times in the same light.

[3] The act itself provides that it shall not apply in certain cases, as appears by the proviso hereinabove mentioned. The exceptions found in that proviso are four: First; casualty; second, unavoidable accident; third, act of God; and, fourth, "Where the delay was the result of a cause not known to the carrier * * * at the time said employé left a terminal and which could not have been foreseen." These four exceptions may be more easily illustrated than defined. First, a large fire and fallen buildings in a city along the right of way of the railroad may illustrate what is meant by casualty; second, a derailment of a train caused by the breaking of an axle having a concealed defect not discoverable by inspection may illustrate unavoidable accident; third, the washing away of bridges by a great flood may illustrate an act of God; and, fourth, a diminution of power by reason of engine trouble not ordinarily expected and not discovered upon previous inspection may illustrate a cause of delay not known to the carrier at the time the employé left a terminal and which could not have been foreseen.

It should not be assumed that any of the terms used by Congress in the proviso are synonymous. All words of an act have a proper place and meaning therein, unless the contrary plainly appears. In the proviso under consideration, "casualty" means a fortuitous happening caused by some human agency which the carrier cannot control; "unavoidable accident" means a fortuitous happening caused by some human agency over which the carrier may have some control, yet which could not have been prevented by the exercise of due care; "act of God" is an accident which could not have been occasioned by human agency, but proceeds from physical causes alone. Because the first three exceptions were not broad enough to cover all the cases which

Congress desired to except from the operation of the act, they added the fourth exception to cover all other cases:

"Where delay was a result of a cause not known to the carrier * * * at the time said employé left a terminal and which could not have been foreseen."

A grammatical analysis of that exception shows that it is not the "delay," but "a cause * * * which could not have been foreseen." This interpretation is necessary to give the word "which" proper meaning. All of the three preceding exceptions do not embrace all causes of delay "which could not have been foreseen." But, by adding the last exception, all were intended to be embraced. To foresee a cause, one could or should know the event before it happens. That delay must follow the cause in every one of the cases excepted by the act must have been known to Congress, yet punishment for *excessive* delay following the cause thereof was not provided.

We are not unmindful of the tendency of some of the courts to make the fourth exception embrace the other three; that is to say, that although there may be a casualty, an unavoidable accident, or an act of God which interrupts the transportation of commerce at one point only upon the railroad, yet, if it be known to the carrier, all transportation should be suspended between terminals and the point where such interruption occurred, unless the carrier, its officers, or agents assume the risk of liability for excess service. We do not believe that such was the intention of Congress. The words of the proviso do not plainly express such intention. If thus intended, Congress would have expressed such meaning in no uncertain terms, because the effect would be to impair the duty and obligation of the railroad company to continue its service for the benefit of those people living between the terminals and the point where the passage of trains has been prevented. Indeed, the very terms of the proviso indicate that commerce was not to be stopped, and that there might be excessive hours of service. It is not unlikely that Congress had in mind conditions such as existed by reason of the Johnstown flood in this district, where operations over the main line of the Pennsylvania Railroad were suspended for days, due to the washing out of bridges. If such a flood should again occur, it could not be imagined that a train dispatcher would be subject to the penalties of this act if, after having knowledge of the flood, he would send out a train for Johnstown and intermediate places, where the crew of said train were required to be on duty longer than 16 hours.

In the present case we have reached the conclusions, fairly deducible from the evidence, that the train dispatcher permitted extra 7460 to proceed, after having knowledge of the unavoidable accident which befell extra 9981, because of his reliance upon the information received from the conductor of the latter train. Apart from that, however, his employer should not be held liable, because the case was one to which the act, by the very terms of its proviso, did not apply.

[4] With respect to the government's contention that the crew of extra 7460 should have been relieved before they reached their terminal, and within the period of 16 hours from the time their service

began, little need be said. To construe the act as one intended to operate upon those who do not shorten the excess service therein denounced, although such excess service arises in any one of the cases excepted from the provisions of the act, would be reading into the act something which Congress has not placed there. In the appendix to Kent's Digest of Decisions under the Federal Safety Appliance and Hours of Service Acts, page 253, we find an administrative ruling of the Interstate Commerce Commission under date of June 25, 1908, which, after quoting the proviso of the act, is in these words:

"Any employé so delayed may therefore continue on duty to the terminal or end of that run. The proviso quoted removes the application of the law to that trip."

[5] As the fourth section of the act imposes upon the Interstate Commerce Commission the duty of executing and enforcing the provisions of the act, such ruling is entitled to great weight, if there be any doubt as to its meaning. We are satisfied that the act should not be strained in order to punish carriers and their officers and agents for not diminishing excess service in those cases which are within the proviso.

From what precedes, therefore, the conclusion must be reached that the accident to extra 9981 was an unavoidable accident, that the excess service required of those in charge of extra 7460 was the result of such unavoidable accident, and that the present case is one to which, by the terms of said proviso, the Hours of Service Act did not apply.

Judgment, therefore, must be rendered in favor of the defendant.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes